IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| **BILLY S. LARGE,** | ) |
| Plaintiff | ) |
| | ) Civil Action No. 2:18cv00035 |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] | ) |
| **Commissioner of Social Security,** | ) By: PAMELA MEADE SARGENT |
| Defendant | ) United States Magistrate Judge |
| | ) |

*I. Background and Standard of Review*

Plaintiff, Billy S. Large, ("Large"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted as the defendant in this case pursuant to Fed. R. Civ. P. Rule 25(d).

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Large protectively filed his application for DIB on February 6, 2015, alleging disability as of June 13, 2014, based on depression, severe anxiety, panic attacks, feelings of uncontrollable rage/anger, suicidal thoughts, thoughts of harming others, paranoia and mood swings. (Record, ("R."), at 162-63, 171, 188-93.) The claim was denied initially and upon reconsideration. (R. at 61-70, 73-83, 86-88, 91, 92-94.) Large then requested a hearing before an administrative law judge, ("ALJ"). (R. at 97-98.) The ALJ held a hearing on August 31, 2017, at which Large was represented by counsel. (R. at 31-60.)

By decision dated January 3, 2018, the ALJ denied Large's claim. (R. at 15-25.) The ALJ found that Large met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2020. (R. at 17.) The ALJ found that Large had not engaged in substantial gainful activity since June 13, 2014, the alleged onset date.[2] (R. at 15.) The ALJ found that the medical evidence established that Large had severe impairments, namely anxiety disorder, major depression, post-traumatic stress disorder, ("PTSD"), cervical degenerative disc disease and obesity, but he found that Large did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-19.) The ALJ found that Large had the residual

---

[2] Therefore, Large must show that he was disabled between June 13, 2014, the alleged onset date, and January 3, 2018, the date of the ALJ's decision, in order to be eligible for benefits.

functional capacity to perform light[3] work except that he could frequently use his upper extremities to push or pull hand controls, occasionally crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 19-23.) The ALJ found that Large could understand, remember and carry out simple job instructions and perform simple jobs that did not require work with the general public and no more than occasional interaction with co-workers and supervisors. (R. at 19-23.) The ALJ found that Large could not perform any of his past relevant work, but, based on Large's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Large could perform, including jobs as a custodian/cleaner, a laundry worker and a hand packer. (R. at 23-25.) Thus, the ALJ concluded that Large was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Large pursued his administrative appeals, (R. at 265-67), but the Appeals Council denied his request for review. (R. at 1-3.) Large then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Large's motion for summary judgment filed March 7, 2019, and the Commissioner's motion for summary judgment filed April 4, 2019.

## II. Facts

Large was born in 1975, (R. at 35, 162, 185), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

and past work experience as a correctional office, including work as a canine officer, a security guard, a heavy equipment operator and a delivery driver. (R. at 35-38, 190.) Large testified that he had not attempted work since 2014, and he began receiving state long-term disability benefits in 2015. (R. at 39-40.) Large said his treating psychiatrist, Dr. Moffet, removed him from work because of his anxiety, depression and panic attacks. (R. at 40.) He said that he also had been diagnosed with PTSD and attention deficit/hyperactivity disorder, ("ADHD"). (R. at 41.) Large said that he had real bad nightmares that would cause him to wake up crying. (R. at 40.) Large said that, in addition to taking medication, he also saw a counselor, but that neither had helped his condition. (R. at 40-41.)

Large testified that he could not be in public or in crowded areas because he would start having a panic attack, get irritated and "feel real violent." (R. at 41.) Large also said that these feeling could "come on for no reason." (R. at 42.) Large said that, when he experienced one of the attacks, he could hardly breathe, his heart pounded, and he felt as if he were having a heart attack. (R. at 42.) Large also testified that he had memory problems. (R. at 42.) He said that he could not focus enough to drive any longer. (R. at 42.) Large said that, if he drove and got around other vehicles, he would "have a panic attack, or the agitation, I start feeling violent." (R. at 42.) Large said, despite taking sleep medication, he slept only four hours a night. (R. at 43.) He said this left him tired, but he could not sleep because his "brain won't shut down. It keeps going." (R. at 43.)

Large testified that he had two "messed up" discs and bone spurs in his neck, which caused him constant pain. (R. at 44.) He said that his arms would tingle and go numb off and on during the day. (R. at 44.) Large said it hurt "to try to pick anything up" or to reach overhead or out in front of him. (R. at 45.) Large said on

good days, he helped around the house with the laundry or vacuuming. (R. at 45.) On a bad day, he said, he just paced through the house and sat on the couch. (R. at 46.) Large said that he had more bad days than good days. (R. at 47.)

Large testified that if he was out and "somebody looks at me wrong, or if they say something I'll just, you know, go off and I will just be really hostile toward them." (R. at 48.) He also said, "I'll snap at my wife for no reason." (R. at 48.)

Barry Hensley, a vocational expert, also was present and testified at Large's hearing. (R. at 53-58.) Hensley testified that a hypothetical individual who had no exertional limitations, could understand, remember and carry out simple instructions and perform simple jobs, could not work with the general public or have more than occasional interaction with co-workers or supervisors could perform Large's past work as a delivery driver. (R. at 54-55.) Hensley also testified that this individual could perform other jobs existing in the national economy, such as a filling machine operator, a custodian and cleaner and a hand packer. (R. at 55.)

Hensley testified that an individual with the limitations listed above and who was limited to light work,[4] could frequently use the upper extremities to push or pull hand controls, occasionally crouch or crawl and could not climb ladders, ropes or scaffolds could perform work as a custodian/cleaner, a laundry worker and a hand packer (R. at 56-57.) Hensley testified that, if the same individual was limited to performing sedentary[5] work, he could perform work as a machine operator, a

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is

materials packer and sealer and a inspector, sorter and tester. (R. at 57.) Hensley said that there would be no jobs this person could perform if he could not work with the general public and could not have any interaction with co-workers or supervisors. (R. at 57.) Hensley said that there would be no work available for an individual capable of performing work at any exertional level, who could not have any interaction with co-workers or supervisors. (R. at 57-58.)

In rendering his decision, the ALJ reviewed medical records from West End Pharmacy; Dr. Eric D. Moffet, M.D.; Susan Meyers, L.C.S.W.; Melinda M. Fields, Ph.D.; Norton Community Hospital; Park Avenue Medical Associates; Dr. Vijay N. Kumar, M.D.; Dominion Health and Fitness; East Tennessee Brain & Spine Center, P.C.; Alamance Regional Medical Center; Louis Perrott, Ph.D, a state agency psychologist; and Jo. McClain, Psy.D., a state agency psychologist.

The record shows that Large was admitted for inpatient psychiatric treatment from January 5-10, 1996, at Alamance Regional Medical Center. (R. at 497-516.) Upon admission, Large's chief complaints were feeling depressed and hearing voices. (R. at 503.) Large said that he could not stop crying, and his depression was worsening. (R at 503.) He complained of difficulty concentrating at work and hearing voices. (R. at 503.) Large complained of feeling tired, losing weight and increased anger and irritability. (R. at 503.) Large admitted some suicidal thoughts but denied any intent. (R at 503.) He admitted that he had overdosed on Xanax the previous year. (R. at 503.) Large complained of neck stiffness and pain radiating into his head after suffering a loss of consciousness in a motor vehicle accident a year

---

defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

and a half earlier. (R. at 504.)

On evaluation, Large was oriented with intact memory and some slight decrease in concentration. (R. at 505.) Large was diagnosed with major depression, single episode, with psychotic features, rule out mood disorder secondary to head injury, rule out excessive compulsive disorder, rule out dysthymia and rule out adjustment disorder with mixed emotional features. (R. at 506.) Large was placed on suicide precautions and placed on anti-depressant and anti-psychotic medications. (R. at 498, 506.)

Upon discharge, Large's mood and sleep had improved. (R. at 499.) Large was less stressed and denied any further auditory hallucinations. (R. at 499.) He was discharged on Haldol and Effexor with a final diagnosis of major depression, single episode, with psychotic features. (R at 499.) He was referred for continuing mental health treatment. (R at 500.)

Dr. Eric D. Moffet, M.D., a psychiatrist, treated Large beginning in August 2011. (R. at 268.) While the record contains medical records from Dr. Moffet from March 12, 2014, to September 13, 2017, most of Dr. Moffet's handwritten notes are not legible. (R. at 273-312, 422-38, 519-21.) Many of these records contain check-box forms for Large's mental status, on many of which Dr. Moffet indicated normal appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, linear thought process and normal judgment. (R. at 276-77, 290-92, 294-98, 307, 310, 312, 424, 429-30, 432, 438.) On August 31, 2011, June 1, 2015, and April 1, 2016, Dr. Moffet checked that Large's mood was depressed and anxious. (R. at 301, 428, 437.) On September 12, 2011 and November 4, 2015, Dr. Moffet checked that Large's mood was euthymic and anxious, but not

depressed. (R. at 300, 431.) On September 26, 2011, Dr. Moffet checked that Large's mood was anxious, but not depressed. (R. at 299.) On July 3 and August 27, 2014, and August 25 and September 23, 2015, Dr. Moffet checked that Large's mood was anxious, depressed and irritable. (R. at 283, 287, 433-34.) On July 17, 2014, Dr. Moffet checked that Large's mood was anxious and irritable, but not depressed. (R. at 286.) On August 1 and 13, 2014, Dr. Moffet checked that Large's affect was both appropriate and blunted, and his mood was anxious and depressed. (R. at 284-85.) On September 23, 2014, Dr. Moffet checked that Large had poor eye contact, his affect was blunted, his mood was anxious, depressed and irritable, and his memory was impaired. (R. at 282.) On October 8, 2014, Dr. Moffet checked that Large's affect was blunted, his mood was anxious and depressed, and he was experiencing delusions and auditory hallucinations calling his name. (R. at 281.) On October 22, 2014, Dr. Moffet checked that Large's mood was anxious and that his thought content was both unremarkable and contained delusions. (R. at 280.) On November 6, 2014, Dr. Moffet checked that Large's mood was euthymic, anxious and euphoric. (R. at 279.) On December 5, 2014, Dr. Moffet checked that Large had poor eye contact, his affect was blunted, and his mood was anxious, depressed, irritable and sad. (R. at 278.) On April 9, 2015, Dr. Moffet checked that Large's mood was depressed and anxious, and his affect was blunted. (R. at 309.) On June 1, 2015, and March 21 and June 27, 2016, Dr. Moffet checked that Large's mood was depressed and anxious. (R. at 306, 422, 426.) On July 25, 2015, Dr. Moffet checked that Large's mood was euthymic, anxious and irritable, but not depressed. (R. at 435.) On September 23, 2015, Dr. Moffet checked that Large's thought content was unremarkable and, also, that he was experiencing delusions. (R at 433.) On February 29, 2016, Dr. Moffet checked that Large's mood was euthymic and depressed, but not anxious. (R. at 427.) On June 6, 2016, Dr. Moffet checked that Large's affect was both appropriate and tearful, and his memory was impaired. (R. at 423.) On

June 27, 2016, Dr. Moffet checked that Large's mood was depressed and irritable, but not anxious. (R. at 422.) Dr. Moffet checked that Large's memory was impaired on July 12, 2017. (R. at 521.) Dr. Moffet checked that Large's mood was euthymic and irritable on August 14, 2017. (R. at 520.) On September 13, 2017, Dr. Moffet checked that Large's affect was both appropriate and blunted, and his mood was anxious. (R. at 519.)

Dr. Moffet completed a Mental Status Evaluation Form on Large on February 27, 2015, which contains no information other than the period of treatment and diagnoses of major depression, anxiety and PTSD. (R. at 268-72.)

Dr. Moffet completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form on December 29, 2015. (R. at 327-29.) On this form, Dr. Moffet stated that Large suffered marked or extreme limitations in making all occupational, performance and personal/social adjustments, except for moderate limitations in his ability to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 327-29.) He stated that Large would be absent an average of more than two days a month due to his impairment or treatment. (R. at 329.)

Dr. Moffet completed another a Medical Assessment of Ability To Do Work-Related Activities (Mental) form on July 10, 2017. (R. at 441-43.) On this form, Dr. Moffet stated that Large suffered marked or extreme limitations in making all occupational, performance and personal/social adjustments, except for moderate limitations in his ability to use judgment in public, to function independently and to understand, remember and carry out simple job instructions and mild limitations in his ability to maintain personal appearance. (R. at 441-42.) He stated that Large

would be absent an average of more than two days a month due to his impairment or treatment. (R. at 443.)

The record contains treatment records from Susan Myers, a licensed clinical social worker, from January 2, 2015, to August 7, 2017. (R. at 314-20, 456-471, 494.) On January 2, 2015, Myers noted that Large complained that he could not relax. (R. at 314.) Large reported that he had suffered a panic attack at work seven months earlier. (R. at 314.) Large reported that he made himself go to work for a month thinking his condition would improve. (R. at 314.) He said that he felt like a failure because Dr. Moffet had taken him out of work. (R. at 314.) He said he had flashbacks. (R. at 314.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his thought process was slowed and rambling, and his judgment/insight was limited. (R. at 314.) Myers diagnosed agoraphobia without history of panic disorder, major depressive disorder, recurrent, severe without psychotic features and rule out PTSD. (R. at 314.)

On January 20, 2015, Myers noted that Large said, "I know I'm talking to you but my mind is doing a million different things." (R. at 315.) Large reported that he felt useless because he had been out of work seven months, and he realized he could not go back to work. (R. at 315.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, moderate to severe irritability, mild to moderate crying spells, moderate to severe panic attacks every time he went out in public, a moderate decrease in energy, a decrease in appetite, severe insomnia, severe decreased attention/concentration and suicidal ideation, but no plan or intent, and no homicidal ideation. (R. at 315.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation and thought process were intact, he did not experience

paranoia or delusions, and his judgment was fair. (R. at 315.) Myers diagnosed agoraphobia without history of panic disorder and major depressive disorder, recurrent, severe without psychotic features. (R. at 315.) She noted patient "is not able to work in the prison." (R. at 315.)

On March 16, 2015, Large told Myers that he sat around and thought about work a lot, and he felt useless. (R. at 316.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, moderate to severe irritability/anger, mild crying spells, mild panic attacks, a severe decrease in energy, a moderate decrease in appetite, moderate insomnia, severe decreased attention/concentration and suicidal ideation with no intent, but no homicidal ideations. (R. at 316.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation and thought process were intact, he did not experience paranoia or delusions, and his judgment and insight were fair to limited. (R. at 316.) Her diagnoses were unchanged from the previous month. (R. at 316.)

On April 13, 2015, Large told Myers that Dr. Moffet had "switched up" his medications, and he felt horrible. (R. at 317.) Large said, "I've hit rock bottom." (R. at 317.) Large reported that he became depressed when his father left when he was a child, but it showed up while his was in high school. (R. at 317.) Myers checked that Large complained of severe depression, severe anxiety, severe irritability/anger, moderate to severe crying spells, moderate panic attacks, a severe decrease in energy, a severe decrease in appetite, severe decreased attention/concentration and suicidal ideation, but no plan or intent, and no homicidal ideations. (R. at 317.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation and thought process were intact,

he did not experience paranoia or delusions, and his judgment and insight were fair. (R. at 317.) Her diagnoses were unchanged. (R. at 317.)

On May 18, 2015, Large told Myers, "It's all crazy right now." (R. at 318.) He said that his mother-in-law had suffered a stroke and was living with his family. (R. at 318.) He said his wife's grandfather also was living with them, and he felt like he was suffocating in his own house. (R. at 318.) Myers checked that Large complained of moderate to severe depression, severe anxiety, moderate irritability/anger, crying spells, very nervous energy, varied appetite, moderate insomnia, moderate decreased attention/concentration and no suicidal or homicidal ideations. (R. at 318.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation and thought process were intact, and his judgment and insight were fair to limited. (R. at 318.) Myers noted that Large reported that his PTSD had been triggered in the hospital with an out-of-control pulse. (R. at 318.) Her diagnoses were unchanged. (R. at 318.)

On June 15, 2015, Large complained that he had been very depressed. (R. at 319.) Myers checked that Large complained of severe depression, severe anxiety, moderate to severe irritability/anger, moderate to severe crying spells, severe panic attacks, a severe decrease in energy, a mild decrease in appetite, severe insomnia, severe decreased attention/concentration and suicidal ideation with no plan or intent, and no homicidal ideations. (R. at 319.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was slowed, and his judgment and insight were fair to limited. (R. at 319.) Myers noted "decompensated … cannot work." (R. at 319.) Her diagnoses were unchanged. (R. at 318.)

On July 29, 2015, Large said that he had been forcing himself to get outside, but he did not enjoy it like he once did. (R. at 471.) Myers checked that Large complained of moderate to severe depression, severe anxiety, severe irritability/anger, mild crying spells, moderate to severe panic attacks, nervous energy, a moderate decrease in appetite, moderate insomnia and severe decreased attention/concentration. (R. at 471.) Myers also checked that Large was suicidal and homicidal without any further explanation. (R. at 471.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, and his judgment and insight were limited. (R. at 471.) Her diagnoses were unchanged. (R. at 471.)

On August 21, 2015, Large stated "I've been rather depressed and wonder why I keep going." (R. at 470.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, moderate to severe irritability/anger, moderate crying spells, severe panic attacks, a severe decrease in energy, a severe decrease in appetite, moderate insomnia and severe decreased attention/concentration. (R. at 470.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 470.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were fair to limited. (R. at 471.) Her diagnoses were unchanged. (R. at 471.)

On September 11, 2015, Large stated "Since I've seen you last it's all went downhill" without further explanation. (R. at 469.) Myers checked that Large complained of severe depression, severe anxiety, severe irritability/anger, severe crying spells, severe panic attacks, a severe decrease in energy, a fluctuating

appetite, moderate insomnia and severe decreased attention/concentration. (R. at 469.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 469.) She noted that Large verbally contracted for his safety. (R. at 469.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact and racing, he did not experience paranoia or delusions, and his judgment and insight were fair to limited. (R. at 469.) Her diagnoses were unchanged. (R. at 469.)

On October 2, 2015, Large told Myers, "I just can't … I thought about letting Dr. Moffet put me in the hospital." (R. at 468.) Myers checked that Large complained of severe depression, severe anxiety, moderate to severe irritability/anger, moderate to severe crying spells, severe panic attacks, a severe decrease in energy, a fluctuating appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 468.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 468.) She noted that Large verbally contracted for his safety. (R. at 468.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was racing, and his judgment and insight were fair to limited. (R. at 468.) Her diagnoses were unchanged. (R. at 468.)

On November 3, 2015, Myers's notes of Large's comments are not legible except that he said he was aggravated at himself a lot. (R. at 467.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, moderate to severe irritability/anger, moderate crying spells, moderate to severe panic attacks, a moderate decrease in energy, a mild decrease in appetite, severe

insomnia and severely decreased attention/concentration. (R. at 467.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 467.) She noted that Large verbally contracted for his safety. (R. at 467.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were limited. (R. at 467.) Her diagnoses were unchanged. (R. at 467.)

On January 7, 2016, Large told Myers he had not drunk since Thanksgiving. (R. at 466.) Myers checked that Large complained of moderate to severe depression, severe anxiety, substance abuse, moderate irritability/anger, moderate crying spells, moderate to severe panic attacks, a severe decrease in energy, a moderate decrease in appetite, moderate insomnia and severely decreased attention/concentration. (R. at 466.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 466.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were fair. (R. at 466.) Her diagnoses were unchanged. (R. at 466.)

Myers completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form on January 15, 2016. (R. at 330-32.) On this form, Myers stated that Large suffered marked or extreme limitations in making all occupational, performance and personal/social adjustments, except for moderate limitations in his ability to function independently and to understand, remember and carry out simple job instructions and mild limitations in his ability to maintain personal appearance

and to demonstrate reliability. (R. at 330-32.) She stated that Large would be absent an average of more than two days a month due to his impairment or treatment. (R. at 332.) Myers also wrote that Large's attention/concentration was severely limited, and under stress, he decompensated. (R. at 331.) She stated that Large could not make performance adjustments. (R. at 331.)

On March 3, 2016, Large told Myers "I'm having such a hard time focusing my attention. … I don't see things getting any better." (R. at 465.) Myers checked that Large complained of moderate to severe depression, severe anxiety, moderate to severe irritability, moderate to severe crying spells, moderate to severe panic attacks, a moderate decrease in energy, a moderate decrease in appetite, mild insomnia and severely decreased attention/concentration. (R. at 465.) Myers also checked that Large had suicidal ideation with no plan and was homicidal without any ideation or plan. (R. at 465.) She noted that he verbally contracted for his safety. (R. at 465.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were fair. (R. at 465.) Her diagnoses were unchanged. (R. at 465.)

On April 6, 2016, Large told Myers "I dream a lot [sic] about killing the people I worked with/inmates. I feel like I'm getting worse." (R. at 464.) Myers checked that Large complained of moderate to severe depression, severe anxiety, moderate to severe irritability/anger, moderate to severe crying spells, moderate panic attacks, a moderate decrease in energy, a moderate decrease in appetite, moderate insomnia and severely decreased attention/concentration. (R. at 464.) Myers also checked that Large had suicidal ideation with no plan and was homicidal

without any ideation or plan. (R. at 464.) She noted that Large verbally contracted for his safety and the safety of others. (R. at 464.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were limited. (R. at 464.) Her diagnoses were unchanged. (R. at 464.)

On May 10, 2016, Large stated, "I can actually kinda sit down on the couch and watch TV…. I drank some again." (R. at 463.)  The report states that Myers did not evaluate Large's symptoms or conduct a mental status examination. (R. at 463.) Her diagnoses were unchanged. (R. at 463.)

On June 10, 2016, Large told Myers "I feel like I never do anything right… Every time I try to do something, no matter how hard I try, nothing is good enough." (R. at 462.) Myers checked that Large complained of moderate to severe depression, severe anxiety, severe irritability, moderate to severe crying spells, moderate to severe panic attacks, nervous energy, a severe decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 462.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 462.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was slowed, he experienced paranoia or delusions, and his judgment and insight were fair to limited. (R. at 462.) Her diagnoses were unchanged from the previous month. (R. at 462.)  Myers noted that she encouraged Large to be more active. (R. at 462.)

On September 7, 2016, Large told Myers that his daughter was driving him

crazy. (R. at 461.) The report states that Myers did not evaluate Large's symptoms or conduct a mental status examination. (R. at 461.)

On January 23, 2017, Myers noted that Large was upset because his irritability with his children was worse. (R. at 460.) Myers noted that Large was self-medicating with alcohol. (R. at 460.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, substance abuse that included having three to four drinks a day, severe irritability/anger, moderate crying spells, moderate panic attacks, a severe decrease in energy, a mild decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 460.) Myers also checked that Large was suicidal with intent, but no plan, and he was homicidal without any ideation or plan. (R. at 460.) She noted that Large verbally contracted for his safety. (R. at 460.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was slowed, and his judgment and insight were limited. (R. at 460.) Her diagnoses were unchanged from the previous month. (R. at 460.)

On March 13, 2017, Myers checked that Large complained of moderate to severe depression, severe anxiety, substance abuse that included drinking a case of beer a week, moderate to severe irritability/anger, moderate crying spells, moderate panic attacks, a severe decrease in energy, a moderate decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 459.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 459.) She noted that Large verbally contracted for his safety. (R. at 459.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his

judgment and insight were fair to limited. (R. at 459.) Myers diagnosed panic disorder with agoraphobia and major depressive disorder, recurrent, severe, without psychotic features. (R. at 459.)

On May 8, 2017, Myers noted that Large's physical health had "decompensated" with increased physical pain and irritability. (R. at 458.) Myers checked that Large complained of moderate to severe depression, moderate to severe anxiety, moderate to severe irritability/anger, moderate to severe crying spells, moderate to severe daily panic attacks, a severe decrease in energy, a moderate decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 458.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 458.) She noted that Large verbally contracted for his safety. (R. at 458.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was slowed, he did not experience paranoia or delusions, and his judgment and insight were fair to limited. (R. at 458.) Myers's diagnoses were unchanged from Large's previous visit. (R. at 458.)

On June 5, 2017, Myers checked that Large complained of moderate to severe depression, severe anxiety, severe irritability/anger, moderate crying spells, moderate to severe panic attacks, a moderate decrease in energy, a moderate decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 457.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 457.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought

process was slowed, and his judgment and insight were fair to limited. (R. at 459.) Myers's diagnoses were unchanged from the previous month. (R. at 457.)

On July 6, 2017, Large told Myers he was "wound up and stressed…. I'm freaked out about the [social security] hearing." (R. at 456.) Myers checked that Large complained of moderate to severe depression, severe anxiety, moderate to severe irritability/anger, moderate crying spells, moderate to severe panic attacks, a moderate decrease in energy, eating only once a day, moderate insomnia and moderately decreased attention/concentration. (R. at 456.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 456.) She noted that Large verbally contracted for his safety. (R. at 456.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was slowed, and his judgment and insight were fair to limited. (R. at 456.) Myers's diagnoses were unchanged from the previous month. (R. at 456.) Myers noted that Large "cannot return to work and is terrified about the [social security] hearing, very close to panic attack in session." (R. at 456.)

Myers completed another Medical Assessment of Ability To Do Work-Related Activities (Mental) form on July 27, 2017. (R. at 473-75.) On this form, Myers stated that Large suffered marked or extreme limitations in making all occupational, performance and personal/social adjustments, except for moderate limitations in his ability to function independently, to understand, remember and carry out simple job instructions and to maintain personal appearance and mild limitations in his ability and demonstrate reliability. (R. at 473-74.) She stated that Large would be absent an average of more than two days a month due to his impairment or treatment. (R. at 475.) Myers also wrote that, under stress, Large

"decompensates making ability to make performance adjustment seriously limited." (R. at 474.) She stated that Large was compliant with treatment but could not function in social situations. (R. at 475.)

On August 7, 2017, Myers checked that Large complained of moderate to severe depression, severe anxiety, severe irritability/anger, moderate crying spells, moderate to severe panic attacks, a moderate decrease in energy, a severe decrease in appetite, moderate insomnia and moderately decreased attention/concentration. (R. at 494.) Myers also checked that Large had suicidal ideation with no intent or plan and was homicidal without any ideation or plan. (R. at 494.) She noted that Large verbally contracted for his safety. (R. at 494.) Myers noted that Large's appearance/grooming was casual and clean, his mood was depressed, his affect was anxious, his orientation was intact, his thought process was intact, he did not experience paranoia or delusions, and his judgment and insight were fair to limited. (R. at 494.) Myers diagnosed agoraphobia without history of panic disorder, major depressive disorder, recurrent, severe without psychotic features and panic disorder with agoraphobia. (R. at 494.)

Melinda M. Fields, Ph.D., a licensed psychologist, performed a mental status evaluation of Large on September 24, 2015. (R. at 321-25.) Large reported initial mental health concerns beginning in childhood. (R. at 321.) Large gave a history of major depressive episodes with psychiatric hospitalization in 1995. (R. at 321-22.) Large reported daily depressed mood, tearfulness, impaired concentration and decision making, lethargy, anhedonia, irritability, withdrawal and feelings of hopelessness and worthlessness, beginning approximately a year and a half earlier. (R. at 322.)   He also complained of insomnia and early awakening, decreased appetite with no recent significant change in weight and passive suicidal ideations

without plan or intent. (R. at 322.) He denied any homicidal ideations or any perceptual disturbances consistent with psychotic processes. (R. at 322.) Large reported chronic worry and rumination, noting "My brain always, always goes." (R. at 322.) He also reported restlessness and agitation. (R. at 322.) He said that he experienced his first panic attack one year earlier while at work and thought he was having a heart attack. (R. at 322.) Large said that, during a panic attack, he experienced perspiration, shaking, shortness of breath, lightheadedness, chest pain/tightness and nausea. (R. at 322.) Large said he experienced nightmares and flashbacks associated with events which occurred while he worked as a correctional officer. (R. at 322.) Large reported that he had seen prisoners who had committed suicide by hanging and had performed CPR on a dead person. (R. at 322.) He said that he had seen other correctional officers injured by prisoners and that he, personally, had been bit, spit on and had feces thrown on him. (R. at 322.) He described hypervigilance, exaggerated startle response, anger outbursts and a sense of detachment. (R. at 322.) Large said he was employed as a correctional officer for 10 years and left this because he "couldn't handle it anymore." (R. at 323.)

Large reported that he slept only three to five hours a night. (R. at 322.) He said that he spent his days at home mainly pacing. (R. at 322.) He said that he could not focus to watch television. (R. at 322.) Large said that he was responsible only for his own hygiene; he said that his wife handled all the household chores, grocery shopping, food preparation and management of finances. (R. at 322.) Large said that he visited his mother infrequently, and he denied any involvement with church, civic or community activities. (R. at 322.)

Fields noted that she reviewed records from Dr. Moffet from 2014 and 2015, which included diagnoses of major depression, anxiety and PTSD. (R. at 322.) She

also noted that she had reviewed notes from Myers from January through June 2015, which included diagnoses of agoraphobia, major depressive disorder and rule out PTSD. (R. at 322.)  Large reported being committed in 1995 in Burlington, N.C., for an overdose of Xanax and Valium. (R. at 322.) He also reported treatment by Dr. Moffet and Myers for the past five to six years. (R. at 322.)

Large reported graduating from high school in regular classrooms with no history of retention and average grades. (R. at 323.)  He denied any social or behavioral difficulties in school. (R. at 323.) He denied any firings or discipline at work, any military service or involvement with law enforcement or criminal charges. (R. at 323.)  Large said that he was raised by his biological mother after his father left when he was three years old. (R. at 323.) Large said that he had not contact with his father, but had a good relationship with his mother. (R. at 323.) Large said that he had been married for 13 years, and he described his marriage as "difficult, she has to put up with me." (R. at 323.)

Fields noted that Large was adequately groomed, and his posture and gait appeared within normal limits. (R. at 321.) Upon, mental status examination, Fields noted no disturbance of visual or auditory acuity, organized and logical stream of thought with no content impairment, no evidence of perceptual abnormalities such as hallucinations or delusions, anxious mood with shaking and movement throughout his body, facial flushing and tearfulness and restricted affect. (R. at 323-24.) Large was cooperative and expended adequate effort, responded to direct questions in a relevant and concrete fashion and was oriented in all spheres. (R. at 323, 324.) Fields noted that Large's insight appeared adequate, but his judgment was impaired "as evidenced by responses to presented scenarios." (R. at 324.) She stated that Large's immediate memory was within normal limits, his remote recall was

adequate, but his recent recall appeared markedly deficient. (R. at 324.) She also noted that Large's concentration appeared impaired, and he required redirection and repetition of questions throughout her interview. (R. at 324.) Fields stated that Large's persistence was within normal limits, his pace was moderately slow and that he interacted in a markedly deficient fashion with her. (R. at 324.)

Fields diagnosed major depressive disorder, generalized anxiety disorder, panic disorder and PTSD. (R. at 325.) She stated that Large's prognosis was guarded with appropriate treatment and mental support. (R. at 325.) Fields opined that it was unlikely that Large would complete a normal workday or workweek without presentation of psychiatric symptoms. (R. at 325.) She said that it was unlikely that Large would tolerate stressors inherent in gainful employment, including the need to interact appropriately with supervisors, co-workers or the public on a regular basis. (R. at 325.)

Large treated with Dr. Vijay Kumar, M.D., from February 9, 2016, to May 4, 2017. (R. at 338-41, 344-346, 361-62.) On February 9, 2016, Large saw Dr. Kumar to establish primary care. (R. at 346.) Large complained of sexual function problems, feeling tired, having mood swings and left foot pain. (R. at 346.) Large stated that he continued to have sharp pain in his left foot after he fractured it in 2001. (R. at 346.) He reported that the pain was worse on activity/exercise and better with nonsteroidal anti-inflammatory drugs and rest. (R. at 346.) Large rated his pain at a 5 on a 10-point scale. (R. at 346.) Large also complained of anxiety and depression. (R. at 346.)

Large returned to see Dr. Kumar on May 11, 2016, with the same complaints. (R. at 344-45.) Dr. Kumar noted that Large was "generally healthy." (R. at 344.) In

particular, Dr. Kumar noted no stiffness, pain, tenderness or masses in Large's neck with no limitation of range of motion. (R. at 344.) Despite Large's complaints of depression and anxiety, Dr. Kumar noted no change in appetite, sleep habits or thought content. (R. at 344.) Dr. Kumar diagnosed hyperlipidemia, testicular hypofunction and anxiety disorder, unspecified. (R. at 345.)

On August 8, 2016, Emily Scott, a family nurse practitioner with Dr. Kumar, noted that Large complained of neck pain. (R. at 342.) Large complained that his neck pain was constant and that he would wake up with pain and go to bed with pain every day. (R. at 342.) Large reported popping his neck several times a day and that this was the only thing that gave him any relief in the pain. (R. at 342.) Despite these complaints, Scott noted on examination that Large had no stiffness, pain or tenderness in his neck. (R. at 342.) Nonetheless, she diagnosed cervicalgia and prescribed Mobic and physical therapy. (R. at 343.)

Large complained of neck pain when he returned to see Dr. Kumar on November 8, 2016. (R. at 340.) Large said that his neck pain was constant, had worsened in the past year, gave him headaches, ran up the back of his head and made his hands tingle. (R. at 340.) Large reported that Mobic had not helped. (R. at 340.) At another point in his report, Dr. Kumar noted that Large denied any headaches. (R. at 340.) He also noted that Large had no stiffness, pain or tenderness in his neck, as well as no limited range of motion or paresthesias or numbness. (R. at 340.) Dr. Kumar noted that Large's neck and spine had no noted deformities or signs of inflammation. (R. at 341.) He noted that Large's lower cervical spine was "tender to palpate" and that flexion, extension and side-to-side rotation of Large's cervical spine caused mild discomfort. (R. at 341.) Dr. Kumar ordered an MRI of Large's cervical spine and prescribed naproxen esomeprazole magnesium. (R. at 341.)

Large had an MRI of his cervical spine on January 10, 2017, which showed multilevel disc osteophyte change. (R. at 334-35.) The vertebral bodies had normal alignment, height and signal intensity with a narrowing of the C5-6 and C6-7 discs with mild desiccation. (R. at 334.) Mild disc osteophyte changes were noted at the C3-4, C5-6 and C6-7 levels with no cord impingement. (R. at 334-35.)

Large returned to see Dr. Kumar on February 7, 2017, with complaints of continuing neck pain. (R. at 338-39.) Dr. Kumar advised Large to avoid heavy lifting and referred him to a neurosurgeon. (R. at 339.) Dr. Kumar completed an Assessment Of Ability To Do Work-Related Activities (Physical) for Large on March 7, 2017. (R. at 348-50.) On this assessment, Dr. Kumar stated that Large could occasionally lift and carry items weighing up to 10 pounds and frequently lift and carry items weighing up to five pounds because lifting/carrying caused Large neck spasm and pain radiating to his hand. (R. at 348.) Dr. Kumar stated that Large could stand and walk for only 15 minutes in an eight-hour workday and for only five minutes at a time because his feet would go numb, and he had left ankle pain. (R. at 348.) Dr. Kumar also stated that Large could sit for only 15 minutes in an eight-hour workday and for only 10 minutes at one time because sitting longer made his low back hurt. (R. at 349.) He stated that Large could occasionally climb, stoop, kneel, balance, crouch and crawl due to neck and low back spasms. (R. at 349.) He also stated that Large's ability to push/pull was affected due to his cervical degenerative disc disease. (R. at 349.) Dr. Kumar also stated that Large could not operate moving machinery because it would cause neck spasms. (R. at 350.) None of Dr. Kumar's records of his medical examinations of Large contain any mention of neck spasms or pain or spasms in Large's back. He said that Large's impairments or treatment would cause him to be absent from work more than two days a month. (R. at 350.)

Dr. Kumar also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Large on March 7, 2017. (R. at 352-54.) Dr. Kumar stated that Large was moderately limited in his ability to make all occupational, performance and personal/social adjustments, except for no limitation in Large's ability to maintain personal appearance, a marked limitation in his ability to deal with the public, to maintain attention/concentration, understand, remember and carry out complex and detailed job instructions and to demonstrate reliability and an extreme limitation in his ability to deal with work stresses. (R. at 352-53.) Dr. Kumar said that these limitations were due to Large's anxiety, panic attacks and trouble with his focus and concentration. (R. at 354.)

Large attended physical therapy at Dominion Health & Fitness on August 17, 2016. (R. at 355-57). Large's chief complaint was severe cervical pain for the past two years. (R. at 355.) Large complained of worsening cervical pain with pain going into his left upper extremity. (R. at 355.) He said that he had to "pop" his neck to get relief. (R. at 355.) He said that he had difficulty with all overhead activity. (R. at 355.) Large said that pain increased with activity and would wake him up at night. (R. at 355.) Large also complained of constant posterior headaches. (R. at 355.) Large reported mild limitation in his ability to walk, to sit and to drive and moderate limitation in his ability to exercise. (R. at 355.) Bernard Dhas, P.T., a physical therapist, stated that Large's active range of motion of his cervical spine was limited to 20 percent flexion, 30 percent extension, 20 percent right side bending, 20 percent left side bending, 20 percent right rotation and 20 percent left rotation. (R. at 356.) Large's cervical and upper extremity muscle testing showed 4/5 strength or better in all areas. (R. at 356.) Dhas recommended continuing physical therapy three times a week for four weeks. (R. at 357.)

Large did not return to see Dhas for physical therapy again until September 15, 2016, when he discharged Large. (R. at 390-92.) On this date, Dhas noted that Large's flexion, extension, right side bending and left side bending ranges of motion were within normal limits. (R. at 390.)

Dr. Kumar noted that Large's blood pressure was high, at 150/102, on May 4, 2017. (R. at 361.) Large complained of a constant throbbing headache and constant neck pain that ran up the back of his head and made his hands tingle and numb. (R. at 361.) Large reported that he was scheduled to have an epidural injection on May 5, 2017. (R. at 361.) Large complained of depressive symptoms, but no changes in sleep habits or thought content. (R. at 361.) Dr. Kumar stated that Large's neck was tender to palpation, and his back muscles were tight and tender between his shoulder blades. (R. at 362.)

When Large saw Dr. Kumar on July 31, 2017, he complained of neck pain and left knee pain starting the week before when he stepped up at the back of a truck. (R. at 490.) Large said that his knee had been swollen since the incident. (R. at 490.) Dr. Kumar noted mild effusion with pain on internal rotation of the left knee. (R. at 491.) A July 31, 2017, x-ray of Large's left knee showed a nondisplaced fracture of the fibular head. (R. at 492.)

Large saw Tracy Gaudu, PA-C, a certified physician assistant with East Tennessee Brain and Spine Center, P.C., on April 4, 2017, to establish care. (R. at 374-76.) Large complained of years of chronic neck pain. (R. at 375.) Large denied any injury or accident and said his neck pain was becoming more intense. (R. at 375.) Large complained of both arms going numb. (R. at 375.) Large said that physical therapy and Mobic had not helped. (R. at 375.) Although Large

complained of pain on all ranges of motion of his neck, Gaudu noted that he moved his neck easily to the left and right with rotation and did not appear to wince or have any pain. (R. at 375.)

On examination, Gaudu noted that Large's muscle strength in his neck was within normal limits, and he had good range of motion of the cervical spine. (R. at 376.) She noted some generalized tenderness to palpation along the posterior cervical paraspinous musculature, but no pain out into his shoulders. (R. at 376.) She noted negative impingement signs and good strength in his upper extremities. (R. at 376.) She did note a bit of decreased sensation in a C6 distribution of the hands bilaterally with no atrophy of the upper extremities. (R. at 376.) Gaudu reviewed a January 10, 2017, MRI of Large's cervical spine and noted no impingement of the spinal cord and only mild central stenosis with some osteophytes. (R. at 376.) Gaudu said that Large's C6 pattern of numbness was consistent with a C5-6 disc herniation. (R. at 376.) She ordered an epidural steroid injection. (R. at 376.)

Large received an epidural steroidal injection treatment on July 12, 2017. (R. at 479-87.) He returned to see Isaac O'Dell, PA-C, a certified physician assistant at East Tennessee Brain and Spine, on July 18, 2017. (R. at 477-79.) Large stated that the epidural injection brought no significant improvement of his pain. (R. at 478.) Large continued to complain of significant pain in his right upper extremity and numbness into his hands with weakened grip strength. (R. at 478.) O'Dell recommended Large undergo an EMG of his right upper extremity to rule out carpal tunnel syndrome. (R. at 479.)

On April 2, 2015, Louis Perrott, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment of Large. (R. at 66-68.) Perrott

opined that Large's ability to remember locations and work-like procedures and to understand and remember very short and simple instructions were not significantly limited, but his ability to understand and remember detailed instructions was moderately limited due to his symptoms of depression, anxiety and PTSD. (R. at 66.) He also stated that Large remained able to understand and remember "1-2 step instructions and simple work procedures." (R. at 66.) Perrott stated that Large's ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them and to make simple work-related decisions were not significantly limited, but his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. (R. at 66-67.) Perrott also stated that Large's ability to ask simple questions or request assistance and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited, but his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes were moderately limited. (R. at 67.) Perrott stated that Large was capable of simple, routine work. (R. at 68.)

On November 21, 2015, Jo McClain, Psy.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment of Large. (R. at 79-81.) McClain opined that Large's ability to remember locations and work-like procedures and to understand and remember very short and simple instructions were

not significantly limited, but his ability to understand and remember detailed instructions was moderately limited due to his symptoms of depression, anxiety and PTSD. (R. at 79-80.) She also stated that Large remained able to understand and remember "1-2 step instructions and simple work procedures." (R. at 80.) McClain stated that Large's ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them and to make simple work-related decisions were not significantly limited, but his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances and to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods were moderately limited. (R. at 80.) McClain also stated that Large's ability to ask simple questions and request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly limited, but his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors were moderately limited. (R. at 80-81.) Perrott stated that Large was capable of simple, routine work. (R. at 81.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Large argues that the ALJ failed to properly evaluate his impairments in

determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Large argues that the ALJ improperly discounted the opinions of his treating physicians and therapist as to his residual mental functional capacity. (Plaintiff's Brief at 5-7.)

The ALJ found that Large had the residual functional capacity to perform light work except that he could frequently use his upper extremities to push or pull hand controls, occasionally crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 19.) The ALJ found that Large could understand, remember and carry out simple job instructions and perform simple jobs that did not require work with the general public and no more than occasional interaction with co-workers and supervisors. (R. at 19-23.) In reaching the determination as to Large's mental residual functional capacity, the ALJ stated that he was giving "great weight" to the opinion evidence offered by the state agency psychologists, Perrott and McClain, because this evidence was consistent with the mental status examinations of Dr. Moffet and Myers. (R. at 21.) The ALJ also stated that he was giving the opinion of Psychologist Fields "little weight" because she examined Large on only one occasion, and her opinion was inconsistent with the mental status examinations of Dr. Moffet and Myers. (R. at 21-22.) The ALJ stated that he was giving Dr. Moffet's opinions regarding Large's work-related abilities "little weight" because Dr. Moffet's own treatment notes did not support them. (R. at 22.) The ALJ also stated that he was giving Myers's opinions regarding Large's work-related abilities "little weight" because they were inconsistent with the mental status examinations of record. (R. at 22.) The ALJ also stated that he was giving Dr. Kumar's opinions regarding Large's mental work-related abilities "little weight" because he was not a mental health professional, his treatment records contained no mental status

examinations, and his opinion was inconsistent with the treatment records of Dr. Moffet and Myers. (R. at 23.) Based on my review of the ALJ's decision, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding as to Large's residual functional capacity.

In particular, I find that substantial evidence supports the ALJ's decision to give "little weight" to Dr. Moffet's opinions regarding Large work-related abilities because his own treatment notes did not support his opinions. While Dr. Moffet's opinions regarding Large's work-related abilities placed severe restrictions on Large, many of Dr. Moffet's check-box records for Large's mental status contain fairly benign findings of normal appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, linear thought process and normal judgment. (R. at 276-77, 290-92, 294-98, 307, 310, 312, 424, 429-30, 432, 438.) When Dr. Moffet's records deviated from these findings, they mainly described changes in Large's mood to anxious, depressed or irritated. These changes in mood alone do not support Dr. Moffet's severe work-related restrictions, especially when you consider that most of Dr. Moffet's handwritten notes are illegible and provide no support for any of his opinions. On the rare occasions that Dr. Moffet's check-box forms indicated some serious finding, they often were contradicted by other information on the form. For instance, on August 1 and 13, 2014, Dr. Moffet checked that Large's affect was both appropriate and blunted. (R. at 284-85.) On October 22, 2014, and September 23, 2015, Dr. Moffet checked that Large's thought content was both unremarkable and contained delusions. (R. at 280, 433.)

I also find that substantial evidence supports the ALJ's decision to give "little weight" to Myers's opinions regarding Large's work-related abilities because they

were inconsistent with the mental status examinations of record. Myers's opinions placed severe restrictions on Large's work-related abilities. Most of Myers's check-box records focus on Large's subjective complaints and his report of their severity. Meanwhile, most of Myers's mental status examination notes state that Large's thought process was intact, and he did not experience paranoia or delusions. At worst, Myers indicated, on occasion, that Large's thought processes were slowed, which the ALJ accounted for by limiting Large to simple work with simple job instructions. It is important to note that, despite indicating severe restrictions on Large's work-related abilities, Myers rarely saw Large more frequently than on a monthly basis.

The evidence listed above to support the ALJ's decision to give "little weight" to the opinions of Dr. Moffet and Myers also supports that ALJ's finding that he was giving the opinion of Psychologist Fields "little weight." Furthermore, the ALJ's decision to give Dr. Kumar's opinions regarding Large's mental work-related abilities "little weight" because he was not a mental health professional was appropriate and supported by the regulations. *See* 20 C.F.R. § 404.1527(c)(5) (2019).

An appropriate Order and Judgment will be entered affirming the Commissioner's decision denying Large's claim for benefits.

DATED:      March 24, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE